IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez

Civil Action No. 23-cv-02976-RMR-MEH

MONIKA WLOCH,

      Plaintiff,

v.

ANGELICA ALFONSO-ROYALS, in her official capacity as Acting Director of the U.S. Citizenship and Immigration Services;
ANDREW LAMBRECHT, USCIS Field Office Director, Colorado;
KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; and
PAMELA BONDI, in her official capacity as U.S. Attorney General,

      Defendants.

---

**ORDER**

---

This case concerns Plaintiff Monika Wloch's ("Plaintiff" or "Ms. Wloch") Petition for Relief under 8 U.S.C. § 1421(c) challenging the denial of her Form N-400 Application for Naturalization. ECF No. 1.

Ms. Wloch applied for naturalization on September 25, 2020. After Plaintiff initiated suit on February 28, 2022 requesting a hearing on her application, the Honorable Judge Nina Wang granted the government's motion to remand so that U.S. Citizenship and Immigration Services ("USCIS") could make an initial determination. *See Wloch v. Jaddou*, No. 22-CV-00495-NYW, 2022 WL 16640782, at *1 (D. Colo. Oct. 24, 2022). USCIS denied Plaintiff's application on February 10, 2023, concluding that Plaintiff had

1

not been lawfully admitted for permanent residence because her marriage to Curt Spencer ("Mr. Spencer") was fraudulent. Plaintiff requested and was provided a hearing by USCIS on her denied naturalization. On July 12, 2023, USCIS again denied Plaintiff's naturalization application.

Plaintiff filed the present action on November 9, 2023. The Court held an evidentiary hearing on July 21, 2025, during which the Court heard testimony from Ms. Monica Wloch, Mr. Curt Spencer, Ms. Anna Spencer,[1] and the Immigration Officer, Adrian Lopez. Additionally, the parties filed Proposed Findings of Fact and Conclusions of Law. ECF Nos. 46 and 47. For the reasons stated below, the Court respectfully **DENIES** Plaintiff's Petition.

## I.    FINDINGS OF FACT

The record supports the following findings of fact:

**A.    Ms. Wloch's Background and Entry into the United States**

1.  Ms. Wloch was born in Poland and is a native citizen of Poland. Stip. Fact #2, ECF No. 42 at 1.

2.  She first came to the United States in 2003 on a short-term visa. Hr'g Tr. 59:22–60:2 (Wloch).

3.  In the summer of 2004, Ms. Wloch returned to the United States on another J-1 visa[2] which expired on September 29, 2004. Hr'g Tr. 59:18–22, 60:5–7 (Wloch).

---

[1] Ms. Anna Spencer is Mr. Spencer's first wife, who is also a native of Poland. For ease and clarity, the Court may refer to Anna Spencer as "Anna."
[2] A J-1 visa is a U.S. non-immigrant visa for individuals participating in approved cultural and educational professional development programs.

This time, when her visa expired, Ms. Wloch remained in the United States and moved to Winter Park, Colorado. Hr'g Tr. 60:8–9; 74:14-16 (Wloch).

**B. Mr. Spencer's Background and Relationship with Anna Spencer**

4. Mr. Spencer was born in the United States and is a U.S. citizen. Stip. Fact #1, ECF No. 42.

5. Mr. Spencer met Anna Spencer ("Anna"), who is also from Poland, in 2000 during her stay in the United States on a J-1 visa. Hr'g Tr. 143:8–12; 144:2–6 (A. Spencer).

6. Mr. Spencer and Anna married in 2003. Hr'g Tr. 144:20–21 (A. Spencer).

7. Anna obtained permanent residence status in the United States based on her marriage to Mr. Spencer. Hr'g Tr. 117:15–20 (C. Spencer); 146:20–147:3 (A. Spencer). Eventually, in 2007, she became a naturalized U.S. citizen. Hr'g Tr. 117:15–20 (C. Spencer); 147:4–8 (A. Spencer).

8. Anna became a partner in Mr. Spencer's taxi business in 2009. Hr'g Tr. 119:12–18 (C. Spencer).

9. Ms. Spencer testified that by Spring 2011, while she was still married to Mr. Spencer, Mr. Spencer had become romantically involved with Ms. Wloch. Hr'g Tr. 170:19–171:7 (A. Spencer). Mr. Spencer and Anna were legally divorced in October 2011. Hr'g Tr. 74:24–75:3 (Wloch); 144:22–23 (A. Spencer); Ex. 18 at 7 (Fraud Detection and National Security Directorate (FDNS) Statement of Findings (SOF)).

10. Mr. Spencer did not tell his family that he and Anna had divorced. Hr'g Tr. 120:22–121:3 (C. Spencer). After the divorce, Mr. Spencer and Anna remained business partners in their taxi business in Winter Park. Hr'g Tr. 80:6–10 (Wloch); 149:15–19 (A. Spencer).

11. Anna remarried in early February 2012. Hr'g Tr. 145:16–18, 146:13–16 (A. Spencer). Her second marriage was to Tomasz Papka, who is also from Poland and lived in the Winter Park area in the mid-2000s. Hr'g Tr. 145:19–20 (A. Spencer).

**C.    Ms. Wloch's Relationship with Mr. Spencer**

12. Ms. Wloch met Mr. Spencer in 2005 in Winter Park. Hr'g Tr. 25:9–13 (Wloch).

13. During this time period, Ms. Wloch, Mr. Spencer, Anna, and Mr. Papka all lived in the Winter Park area and knew one another. Hr'g Tr. 72:7–73:4 (Wloch); 129:8–10 (C. Spencer); 147:12–148:3 (A. Spencer); *see also* Hr'g Ex. 26 (photograph of Ms. Wloch, Ms. Spencer, and Mr. Papka).

14. On January 17, 2012, Ms. Wloch and Mr. Spencer married at the Denver courthouse. There were no attendees at their wedding, and they did not celebrate their wedding with any of their friends. Hr'g Tr. 59:1-4; 77:23-79:4 (Wloch).

**D.    Ms. Wloch's Immigration Filings and Fabricated Cohabitation Evidence**

15. In May 2012, with Mr. Spencer's help, Ms. Wloch sought conditional permanent resident status from USCIS. Hr'g Tr. 61:8–10 (Wloch).

16. On May 10, 2012, Mr. Spencer filed a Form I-130 (Petition for Alien Relative) with USCIS on Ms. Wloch's behalf. Hr'g Ex. 1. The Form I-130 was accompanied by

supporting documentation intended to substantiate the validity of Ms. Wloch's and Mr. Spencer's relationship. Hr'g Tr. 63:2–4, 13–16 (Wloch). Ms. Wloch and Mr. Spencer compiled the supporting documentation for the Form I-130 together. Hr'g Tr. 63:5–12 (Wloch).

17. To demonstrate that they resided together from April 2011 to April 2012, Ms. Wloch and Mr. Spencer submitted a fabricated lease for 74860 Highway 40, Grand County, Colorado. Hr'g Tr. 64:16–65:7 (Wloch); *see also* Hr'g Ex. 11. Both later admitted that 74860 Highway 40 was not a residential address but the office of Mr. Spencer's and Anna's taxi business. Hr'g Tr. 65:8–19 (Wloch). Ms. Wloch did not reside at that address during the period claimed. Hr'g Tr. 65:10–12 (Wloch). No other documentation was submitted to USCIS to substantiate that Ms. Wloch and Mr. Spencer lived together between April 2011 and April 2012. Hr'g Tr. 66:21–24 (Wloch). Additionally, on May 10, 2012, Ms. Wloch filed a Form I-485 (Application to Register Permanent Residence or Adjust Status) with USCIS, accompanied by a Form G-325A. Hr'g Ex. 2, Hr'g Ex. 3. On the Form G-325A, Ms. Wloch falsely stated that she resided at 72860 U.S. Highway 40 from April 2011 through March 2012. Hr'g Ex. 3 at 1. Although the address listed on the Form G-325A differs slightly from the address on the fabricated lease, Ms. Wloch admitted that she intended the Form G-325A to refer to the same location–Mr. Spencer's business address. Hr'g Tr. 68:7–9 (Wloch).

18. Ms. Wloch testified that from April 2011 through April 2012, she lived with Mr. Spencer in a cabin near Fraser, Colorado. Hr'g Tr. 68:24–69:2 (Wloch). They did

not have a lease for the cabin because it was a month-to-month rental through a friend. Hr'g Ex. 7 ¶¶ 13–14.

19. In an affidavit submitted to USCIS, Ms. Wloch stated that she submitted the false lease because she was ashamed of living with a married man and wanted to keep the relationship private until Mr. Spencer's divorce was finalized. Hr'g Ex. 7 ¶ 14.

**E.    Ms. Wloch's Early Marriage to Mr. Spencer and His Continued Relationship with Anna**

20. In April 2012, four months after she and Mr. Spencer married, Ms. Wloch moved to Denver. Hr'g Tr. 79:10–15 (Wloch). After Ms. Wloch moved to Denver, Mr. Spencer continued to run his taxi business in Winter Park along with Anna. Hr'g Tr. 80:3–7 (Wloch).

21. In May 2012, Mr. Spencer and Anna traveled to Thailand, where they stayed for two weeks, sharing a hotel room. Hr'g Tr. 81:1–9 (Wloch); 112:16–23, 129:17–20 (C. Spencer); 157:18–20 (A. Spencer); Hr'g Ex. 7 at 3–4 ¶ 33 (affidavit). According to Mr. Spencer, the purpose of the trip was to acquire scooters for his and Anna's business. However, Mr. Spencer and Anna also did some sightseeing. Hr'g Tr. 130:14–16 (C. Spencer). Mr. Spencer provided inconsistent testimony about whether he told Ms. Wloch about his trip to Thailand with Anna. At one point, he testified that he did not tell her about the trip. Hr'g Tr. 129:21-23 (C. Spencer). Later, he testified that he did tell her and described it as a business trip. Hr'g Tr. 130:1–13 (C. Spencer). In their affidavit, Mr. Spencer again stated that he did not tell Ms. Wloch about the Thailand trip and instead told her he was "going to the

6

mountains." Ex. 7¶ 33. Ms. Wloch testified that she did not know that Mr. Spencer traveled with Anna to Thailand. Hr'g Tr. 81:14–22 (Wloch).

22. On August 2, 2012, USCIS approved Ms. Wloch's Form I-485 and Mr. Spencer's Form I-130, and Ms. Wloch received conditional permanent residency status. Hr'g Ex. 1; Hr'g Ex. 2. After receiving conditional status, Ms. Wloch traveled to Poland in October 2012. Hr'g Tr. 61:8–62:1 (Wloch); Ex. 18 at 8 (FDNS SOF). Mr. Spencer did not go to Poland with her. Hr'g Tr. 62:2–3 (Wloch). Ms. Wloch visited Poland twice again without Mr. Spencer. Hr'g Tr. 62:4–11 (Wloch); Hr'g Ex. 18 at 8–9. Mr. Spencer never met Ms. Wloch's family in Poland. Hr'g Tr. 62:12–19 (Wloch) Ms. Wloch likewise was never formally introduced to Mr. Spencer's parents because their marriage was kept a secret from Mr. Spencer's family. Hr'g. Tr. 103:10–104:14.

23. In late 2012 or early 2013, Mr. Spencer conceived a child with Anna during his marriage to Ms. Wloch. Hr'g Tr. 130:19–131:1 (C. Spencer).

24. In April 2013, Mr. Spencer applied to renew his passport and listed Anna as his emergency contact and her Lakewood address as his own. Hr'g Tr. 136:24–138:1 (C. Spencer); Ex. 16 at 3–4.

25. Mr. Spencer and Anna's son was born in October 2013. Hr'g Tr. 160:12-19 (A. Spencer). Mr. Spencer visited him approximately twice a week at Anna's home in Lakewood. Hr'g Tr. 131:2-4 (C. Spencer). Mr. Spencer said that he stayed overnight on "a couple" of these occasions. Hr'g Tr. 131:2–6 (C. Spencer).

26. When interviewed by Immigration Officer Adrian Lopez by phone, Mr. Spencer denied having a child with Anna during his marriage to Ms. Wloch. Hr'g Ex. 18 at 5.

### F.    Removal of Conditions

27. On June 18, 2014, Plaintiff submitted Form I-751 (Petition to Remove Conditions) to USCIS, jointly with Mr. Spencer, to remove the conditions on her legal permanent residency status. Hr'g Ex. 4. In her Petition, Plaintiff attested that she was in a legitimate marriage with Mr. Spencer and that they continued to reside together. To demonstrate that they lived together, Plaintiff submitted a joint health insurance policy, Hr'g Ex. 40, utility bills for the address of record, Hr'g Exs. 33, 34, bank statements, Hr'g Ex. 35, a joint auto loan, Hr'g Ex. 40, an individual tax return from 2013 with the address of record, Hr'g Ex. 37, and a lease for the address of record, Hr'g Ex. 36.

28. They did not list Mr. Spencer's son on the Form I-751, despite the form's instruction to disclose all children. Tr. 134:12–21 (C. Spencer); Ex. 4 at 3–4.

29. On August 1, 2014, USCIS approved the Form I-751, removing the conditions on Ms. Wloch's permanent resident status. Ex. 4.

30. In August 2014, Mr. Spencer purchased a motorcycle and listed Anna's Lakewood address as his own. Tr. 134:22–136:6 (C. Spencer); Ex. 15 at 5.

31. On September 23, 2014, Anna and Mr. Papka jointly filed a Form I-751 (Petition to Remove Conditions). Ex. 18 at 9. Similarly, they did not list Anna's and Mr. Spencer's son. Ex. 18 at 12.

8

32. In October 2014, when their son was about a year old, Mr. Spencer and Anna traveled to Florida to introduce their son to Mr. Spencer's mother. Tr. 131:7–12 (C. Spencer); 161:7–16 (A. Spencer).

33. On April 21, 2015, USCIS approved Anna's and Mr. Papka's Form I-751, removing the conditions on Mr. Papka's permanent resident status. Ex. 18 at 9.

34. In May 2015, during his marriage to Ms. Wloch, Mr. Spencer and Anna traveled to Poland with their son to introduce him to Anna's family. Hr'g Tr. 131:13-19 (C. Spencer). Ms. Spencer never travelled to Poland with Mr. Papka. Tr. 155:18–156:3 (A. Spencer).

35. Ms. Wloch and Mr. Spencer filed for divorce on August 10, 2015. On November 13, 2015, Ms. Wloch and Mr. Spencer were divorced. Hr'g Ex. 18 at 10. In 2015, before their divorce, Mr. Spencer was living with Anna at Anna's home in Lakewood. Tr. 166:2–4 (A. Spencer).

36. Anna and Mr. Papka divorced on December 31, 2015. Hr'g Tr. 146:17–19; Hr'g Ex. 18 at 10. Following the divorce, Mr. Spencer and Anna remarried and lived together at the Lakewood residence until their second divorce in July 2020. Tr. 121:13–15 (C. Spencer). Mr. Spencer told his family about their 2020 divorce. Tr. 122:17–19 (C. Spencer).

37. After her divorce from Mr. Spencer, Ms. Wloch eventually remarried. Tr. 62:14–15 (Wloch). Unlike Mr. Spencer, Ms. Wloch's second husband has traveled to Poland with her and has met her father. Tr. 62:16–19 (Wloch).

9

38. Ms. Wloch has only eight photographs of her and Mr. Spencer together. Tr. 93:5–21 (Wloch). One of these photographs shows Ms. Wloch and Mr. Spencer in the same place as a photograph of Anna and Mr. Papka. Ex. 25; Ex. 28.

39. Ms. Wloch has no emails, text messages, or social media posts about Mr. Spencer. Tr. 94:11–18 (Wloch).

**G.    Naturalization Application and USCIS Fraud Investigation**

40. On September 25, 2020, Ms. Wloch applied for naturalization. Hr'g Ex. 5. Her application was referred to Immigration Officer Lopez for fraud investigation. Hr'g Tr. 176:23–177:3 (Lopez).

41. On October 28, 2022, USCIS sent Ms. Wloch a Notice of Intent to Deny her Form N-400 (Application for Naturalization) on the grounds that Plaintiff's marriage to Mr. Spencer was fraudulent. Hr'g Ex. 6.

42. USCIS found that the lease documents Plaintiff submitted to demonstrate that she and Mr. Spencer resided together during their marriage were fabricated and that they did not reside together during their marriage. *Id.* When USCIS visited Mr. Spencer's current residence, his mother stated he had been married only once, to Anna, indicating that she was unaware of her son's marriage to Ms. Wloch. *Id.*

43. USCIS found that Mr. Spencer consistently listed Anna's Lakewood address as his own: on his 2013 passport application and on vehicle registrations in 2014 and 2015. *Id.*

10

44. When USCIS contacted Mr. Spencer by phone on January 7, 2022, he confirmed that he maintained a residential address with Anna during his marriage to Ms. Wloch. Hr'g Ex. 18 at 5.

45. USCIS determined that Mr. Spencer did not reside with Plaintiff during their purported marriage but instead with Anna. Hr'g Ex. 6 at 3.

46. USCIS also concluded that Mr. Spencer's relationship with his ex-wife, Anna, never ended during his marriage to Plaintiff. *Id.* First, USCIS pointed to the fact that Mr. Spencer fathered a child with Anna in 2013, during his marriage to Plaintiff. *Id.* USCIS also noted that there appears to have been a concerted effort to omit that child from the subsequent Form I-751 jointly filed in 2014. *Id.* The child was also not disclosed during Plaintiff's N-400 interview or included as a dependent on the 2013 tax returns Plaintiff filed jointly with Mr. Spencer. *Id.* Second, USCIS pointed to travel records showing that Mr. Spencer and Anna traveled internationally together on multiple occasions during his purported marriage to Plaintiff, whereas Mr. Spencer never traveled abroad with Plaintiff, even though Plaintiff traveled several times internationally during the marriage without him. *Id.*

47. Based on this evidence that Plaintiff's marriage to Mr. Spencer was fraudulent, USCIS determined that Plaintiff's permanent residency was not lawfully obtained. *Id.* at 4.

48. In response, Plaintiff and Mr. Spencer jointly submitted an affidavit. Hr'g Ex. 7. The affidavit confirmed that Mr. Spencer concealed their marriage from his family, continued using Anna's address, and submitted a falsified lease for the 74860

11

Highway 40 address. They also submitted letters from Cornerstone Urban Apartment Living indicating that they did live together at 950 Lafayette Street #305 from April 2012 to July 2015. Hr'g Ex. 36.

49. USCIS denied Plaintiff's Application for Naturalization on February 10, 2023. Hr'g Ex. 8.

50. Plaintiff requested and was provided an administrative hearing challenging the denial. On July 12, 2023, USCIS again denied Ms. Wloch's application for citizenship. Hr'g Ex. 10.

## II.    LEGAL STANDARD

Congress has directed courts to review applications for naturalization *de novo*. 8 U.S.C. § 1421(c). Accordingly, the Court must make its "own findings of fact and conclusions of law." *Id.* As the Tenth Circuit has noted, this "grant of authority is unusual in its scope—rarely does a district court review an agency decision *de novo* and make its own findings of fact." *Nagahi v. Immigr. & Naturalization Serv.*, 219 F.3d 1166, 1169 (10th Cir. 2000). Thus, in reviewing an application for naturalization, "the Court does not defer to any of the Defendant's factual findings or conclusions of law." *Giger v. USCIS*, 635 F. Supp. 3d 1136, 1138 (D. Colo. 2022).

However, a naturalization applicant bears the burden of showing her eligibility and compliance with all naturalization requirements. *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967). "There must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko v. United States*, 449 U.S. 490, 506 (1981). Therefore, any "doubts about eligibility should be resolved in favor of the

12

United States and against the claimant." *Berenyi*, 385 U.S. at 637 (internal quotation marks omitted).

To qualify for naturalization, an applicant must show that she: (1) has "been lawfully admitted for permanent residence," has resided continuously in the United States for at least five years immediately preceding the application for naturalization, has been physically present in the United States for at least half of those five years, and has resided within the state of application for at least three months; (2) "has resided continuously within the United States from the date of application up to the time of admission to citizenship"; and (3) during all of these periods, "has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." 8 U.S.C. § 1427(a). "No person shall be naturalized unless [she] has been lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1429.

The first requirement—whether Plaintiff was lawfully admitted for permanent residence—is the central issue in this case.[3] A noncitizen may obtain permanent residence through marriage to a U.S. citizen, but only if she proves by a preponderance of the evidence that the marriage was entered into in good faith and not for the purpose of procuring immigration status. 8 U.S.C. §§ 1154(c), 1186a(b)(1)(A)(i), (d)(1)(A)(i)(III). Simultaneously, the Immigration and Nationality Act ("INA") prohibits any individual from "knowingly entering into a marriage for the purpose of evading any provision of the

---

[3] Defendants also contest that Plaintiff satisfies the "good moral character" requirement. However, their position rests solely on their assertion that Plaintiff's testimony regarding the nature of her marriage to Mr. Spencer is not truthful.

immigration laws." *Id.* § 1325(c). Such marriages are commonly referred to as "sham marriages" as opposed to "*bona fide* marriages." *Olumuyia v. USCIS*, No. 1:22-cv-02530-NYW, 2023 WL 7686297, at *2 (D. Colo. Nov 15, 2023).

The key inquiry in determining whether a couple entered into a sham marriage is whether they "intended to establish a life together at the time they were married." *Vladimirov v. Lynch*, 805 F.3d 955, 961 (10th Cir. 2015). Conduct after the marriage is relevant to determining that intent. *Akopyan v. Sessions*, No. 17-CV-01724-RBJ, 2018 WL 6249885, at *5 (D. Colo. Nov. 29, 2018), *aff'd sub nom. Akopyan v. Barr*, 786 F. App'x 829 (10th Cir. 2019).

In assessing a finding of marriage fraud, courts apply a "substantial and probative evidence" standard of review. *Id.* Evidence meets this threshold when it is more than probably true that the marriage was fraudulent. *Matter of P. Singh*, 27 I. & N. Dec. 598, 607 (BIA 2019). A mere reasonable inference of fraud is insufficient. *Matter of Tawfik*, 20 I. & N. Dec. 166, 167–68 (BIA 1990). Nevertheless, "even if particular facts 'may not [be] sufficient individually to establish a finding of fraud,' those same facts, when taken together, may provide 'ample support' for an agency to infer a fraudulent marriage." *Atieh v. Riordan*, 797 F.3d 135, 140 n.4 (1st Cir. 2015).

"[M]aterials which may demonstrate that a marriage is bona fide include: (1) documentation showing joint ownership of property; (2) a lease showing joint tenancy of a common residence; (3) evidence of commingling of financial resources; (4) birth certificates of children born to the petitioner and beneficiary; (5) affidavits of third parties having knowledge of the bona fides of the marital relationship; and (6) any other

14

documentation which is relevant to establish that the marriage was not entered into in order to evade the immigration laws of the United States." *Doe v. Att'y Gen. of U.S.*, 383 F. App'x 214, 218–19 (3d Cir. 2010) (citing 8 C.F.R. § 204(a)(1)(i)(B)). "Significant inconsistencies coupled with minimal documentary evidence of a shared life may support a conclusion" that the petitioner has failed to carry her burden. *Awan v. Mather*, No. 2:23-cv-00258-DBB-DAO, 2023 WL 7002617, at *5 (D. Utah Oct. 24, 2023) (citing 8 C.F.R. § 204(a)(1)(i)(B)(5)).

### III.    ANALYSIS

Plaintiff has not carried her burden to demonstrate that her marriage to Mr. Spencer was *bona fide*. This Court held a hearing where it heard testimony and received exhibits. The Court has reviewed the agency decision *de novo* and made its own findings of fact. The record contains substantial and probative evidence that the marriage was not entered into with the intent to establish a life together.

### A.    Plaintiff knowingly submitted fabricated leases to demonstrate cohabitation.

First, the evidence strongly indicates that Plaintiff knowingly submitted fabricated leases to demonstrate cohabitation with Mr. Spencer. As the BIA has explained, "[e]vidence that the parties knowingly and deliberately attempted to mislead or deceive immigration officials regarding their cohabitation, joint finances, or other aspects of the marriage strongly indicate fraud." *Matter of P. Singh*, 27 I. & N. Dec. at 609.

Plaintiff and Mr. Spencer expressly admitted in their joint affidavit that the lease they submitted for the claimed joint residence at 74860 Highway 40, Grand County, Colorado, for the period of April 1, 2011, to April 1, 2012, was fabricated. They concede

15

that no lease existed for that residence and that they altered Mr. Spencer's business lease to demonstrate that they resided together during this period. Hr'g Ex. 7 ¶ 14.

USCIS also found inconsistencies with the other lease Plaintiff submitted for 950 Lafayette Street, Unit #305, Denver, CO 80208, for the period from April 27, 2012, to April 26, 2013. During their investigation, USCIS contacted the property manager, Cornerstone Urban Apartment Living ("Cornerstone"). Jim Lorenzen, the president and founder of the company whose name appears on the lease, stated that the document is not the one his company uses and that his signature was forged. The subsequent letters Plaintiff submitted from a different Cornerstone employee do not authenticate the lease and contain no documentary evidence establishing that the couple resided there during this period. Hr'g Ex. 18 at 6. The agency thus concluded that Plaintiff relied on at least two fraudulent leases to substantiate the marriage, and this Court agrees. Such deliberate misrepresentations weigh heavily against a finding that the marriage was genuine at inception.

**B.     Government records demonstrate that Mr. Spencer consistently resided with Anna Spencer, not Plaintiff, throughout the marriage.**

Independent government records further undermine Plaintiff's claim of a shared life. Multiple documents show that Mr. Spencer consistently represented his residence as 71 Lamar Street–Anna Spencer's address–throughout his alleged marriage to Plaintiff.

In his 2013 passport application, Mr. Spencer listed the Lamar Street address and identified Anna as his emergency contact. He used that same address again in registering two vehicles in 2014 and 2015. His divorce records likewise reflect that his residence at the time of the dissolution of his marriage to Plaintiff was the Lamar Street address with

16

Anna. When confronted with these contradictions by USCIS, Mr. Spencer merely stated,

"we may have had addresses," a response that does little to dispel the inference arising

from years of consistent documentation. Taken together, this Court finds these records

strongly suggest that Mr. Spencer resided with Anna, not Ms. Wloch, during the relevant

period.

**C.     Mr. Spencer maintained an ongoing relationship with Anna, undermining Plaintiff's claims of a *bona fide* marriage.**

The record also demonstrates that Mr. Spencer maintained an ongoing romantic

relationship with Anna during his marriage to Plaintiff. Notably, he fathered a child with

Anna in 2013, squarely within his marriage to Plaintiff. The child was omitted from the

couple's jointly filed Form I-751, was not disclosed during Plaintiff's naturalization

interview, and did not appear on the couple's 2013 joint tax return. "Evidence that the

parties have other romantic partners, with whom they may have children, is also a

significant consideration, especially when these facts are either not disclosed or are

deliberately concealed." P. Singh, 27 I. & N. Dec. at 609.

The couple's travel records further underscore the absence of a bona fide

marriage. Plaintiff traveled to Poland, where her family resides, on three separate

occasions during the marriage. She traveled alone each time, and Mr. Spencer was never

taken to meet her family. Given that Plaintiff made repeated trips to her home country and

yet never introduced her spouse to her family, the evidence strongly suggests a lack of

intent to establish a life together.

In stark contrast, Mr. Spencer traveled internationally with Anna multiple times

during his marriage to Plaintiff. Mr. Spencer traveled internationally with Anna within just

four months of marrying Plaintiff. Most notably, in 2015, Mr. Spencer traveled with Anna and their child to Poland to introduce their son to Anna's family. This trip highlights the continuing familial commitment between Mr. Spencer and Anna during his marriage to Plaintiff. Although Plaintiff and Mr. Spencer assert that they were separated by that time, the record indicates that during the 2015 trip, Mr. Spencer and Anna represented to Anna's family that they had never gotten divorced and were still married. This behavior is irreconcilable with Plaintiff's claim that her marriage to Mr. Spencer was genuine.

Further, during USCIS's investigation, when officers asked Mr. Spencer's mother how many times her son had been married, she responded, "one time, to Anna." Plaintiff and Mr. Spencer attempt to explain this by asserting that he concealed his marriage to Plaintiff due to his parents' religious objections to divorce. But the BIA has recognized that "[s]tatements from family members… indicating they do not know about the marriage… [is] indicia of fraud." Matter of P. Singh, 27 I. & N. Dec. at 609. The fact that Mr. Spencer's own mother and father were unaware of his marriage to Plaintiff, therefore, weighs heavily against a finding of their *bona fide* marriage.

**D.     Plaintiff lacks objective evidence of a shared life, including joint assets or meaningful documentation of a *bona fide* marriage.**

Other objective evidence of a *bona fide* marriage is notably absent. Although Plaintiff purchased two condominiums during the marriage, both were titled solely in her name. Hr'g Ex. 18 at 9–10. In their joint affidavit, Plaintiff asserts that she bought the second condominium in June 2015 without Mr. Spencer because they were in the process of separating. Hr'g Ex. 7 ¶ 30. But Plaintiff purchased the first condominium in October

18

2013 during their marriage. Hr'g Ex. 7 ¶ 24. The absence of any jointly held property further undermines Plaintiff's claim.

Similarly, Plaintiff produced only eight photographs in response to a request for all images documenting the marriage. Two appear to have been taken on the same day because they are wearing the same outfits, and another mirrors the location and posture of a photograph featuring Anna and her second husband, Tomasz Papka. This photo, presented at the hearing, was highly suspicious, indicating that both couples went to the same place on the same day to create photos to support their marriages. At a minimum, the minimal evidence of shared experiences is inconsistent with a couple intending to build a life together.

### E.    Wloch's marriage to Curt Spencer was for the purpose of obtaining an immigration benefit.

A noncitizen can obtain permanent resident status through marriage to a U.S. citizen. *See Bouarfa v. Mayorkas*, 604 U.S. 6, 9 (2024) (summarizing "the pathway to permanent legal status for a noncitizen spouse of a U.S. citizen"). If the marriage is less than two years old when the noncitizen seeks permanent resident status, there is a two-step process, requiring multiple submissions to USCIS. *United States v. Islam,* 418 F.3d 1125, 1128, 1128 n.2 (10th Cir. 2005) (describing the process).[4] A noncitizen may not,

---

[4] Specifically, first, in coordination with their spouse, the noncitizen may apply for *conditional* permanent resident status. *See* 8 U.S.C. § 1255(a) (permitting applications for adjustment of status); *id.* § 1186a(a)(1), (h)(1) (providing that "an alien spouse" may obtain such status "on a conditional basis"). To obtain conditional permanent resident status, the noncitizen's spouse must file a properly supported Form I–130, Petition for Alien Relative. *See* 8 C.F.R. § 204.1(a)(1) (requiring an I-130); *id.* § 204.1(f)–(g) (specifying contents of the I-130). In addition, the noncitizen must file a Form I-485, Application to Register Permanent Residence or Adjust Status, accompanied by a Form G-325A, Biographic Information. *See id.* § 245.2(a)(3). Second, within ninety days before the two-year anniversary of obtaining conditional permanent resident status, the noncitizen and their spouse can file a joint petition to

however, obtain permanent resident status based on a marriage "entered into for the purpose of procuring [their] admission as an immigrant." 8 U.S.C. § 1186a(b)(1)(A)(i), (d)(1)(A)(i)(III); *see also United States v. Windsor*, 570 U.S. 744, 765 (2013) ("Congress [has] determined that marriages entered into for the purpose of procuring an alien's admission to the United States as an immigrant will not qualify the noncitizen for that status." (cleaned up and quotation omitted)).

The many parallels between Mr. Spencer's and Anna's brief second marriages cast even more significant doubt on Ms. Wloch's marriage. Both Mr. Spencer and Anna remarried within a few months of their divorce. ECF No. 46 ¶¶ 14, 19, 30. Both second marriages were to people from Poland whom they had known for years from the Winter Park community, and who had overstayed their short-term visas. *Id.* ¶ 34. Applications for conditional permanent resident status closely followed both second marriages. *Id.* ¶¶ 35, 67. And shortly after those conditions were lifted, Mr. Spencer and Ms. Spencer were living together, and both second marriages ended. *Id.* ¶¶ 75, 80, 84–85, 87–88. These appear to be "coincidences" too clear to be overlooked by this Court. Coupled with the photographs of the two couples taken in front of the same backdrop submitted to support their respective marriages, this Court finds it highly likely that the photos were to support a marriage entered into to obtain admission rather than a bona fide marriage.

---

remove the conditions, 8 U.S.C. § 1186a(c)(1), (d)(2), using Form I-751, Petition to Remove the Conditions on Residence, *see* 8 C.F.R. § 216.4(a)(1). At this step, Congress requires "facts and information" about the marriage. 8 U.S.C. § 1186a(d)(1).

## V. CONCLUSION

Taken together, the fabricated leases, the documentary evidence showing Mr. Spencer's residence with Anna, the concealed child and continued family relationship between Mr. Spencer and Anna, Plaintiff's failure to integrate Mr. Spencer into her family life, the absence of shared assets, and the lack of corroborating evidence demonstrate that Plaintiff's marriage to Mr. Spencer was not entered into in good faith but instead entered into for the purpose of procuring immigration status. Plaintiff has therefore failed to meet her burden to demonstrate that she was lawfully admitted for permanent residence as required for naturalization. For the foregoing reasons, it is ordered that Plaintiff's Petition is respectfully **DENIED**.

DATED:  April 6, 2026

BY THE COURT:

_____

REGINA M. RODRIGUEZ
United States District Judge